Filed 2/18/22  P. v. Cummings CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076942 |
| v. | (Super.Ct.No. 21PA000383) |
| DAVID TYMEL CUMMINGS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Smith, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Heather E. Shallenberger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

The trial court revoked defendant and appellant David Tymel Cummings's parole after he failed to charge the battery on his global positioning system (GPS) tracking device as required and failed to attend his sex offender treatment program.  The court sentenced him to serve 180 days in county jail.  On appeal, defendant contends (1) the trial court erred when it admitted inadmissible hearsay evidence at his parole revocation hearing, and (2) the trial court erred in finding he willfully violated his parole.  We reject these contentions and affirm the order revoking his parole.

II.

BACKGROUND

On September 27, 2020, defendant was released on parole following a four-year prison term for sexual battery in violation of Penal Code[1] section 243.4, subdivision (a). One of his parole conditions required him to wear a GPS or other device for continuous electronic monitoring.  (§ 3010.10 [requiring paroled sex offenders to wear a GPS device.].)  Defendant was required to charge his GPS device at least twice a day (every 12 hours) for a full hour each time.  Additionally, he was required to immediately contact his parole agent if the GPS device vibrated or made an audible tone.  A separate parole condition required him to attend and participate in an approved sex offender program that consisted of group and individual treatment sessions.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

Following a parole revocation petition alleging that defendant had disabled his GPS device and failed to attend a group session of his treatment program, the court held a formal parole violation hearing. At the hearing, the People presented the testimony of the parole agent who had been assigned to supervise defendant. The agent's unit monitored the locations of 296 sex offenders via a GPS monitoring system called VeriTracks.

The agent testified that on March 11, 2021, the VeriTracks monitoring center notified his supervisor that defendant's device had been rendered inoperable by a dead battery. The agent also received a text from the monitoring system alerting him that defendant's battery was dead. The agent looked defendant up on the VeriTracks system and verified that his battery was dead. According to the VeriTracks file, the battery went dead at approximately 1:34 a.m.

The March 10, 2021 VeriTracks records indicated that defendant charged the GPS device in the morning for approximately 55 minutes and then in the evening for approximately one minute. The agent testified that both of these charging attempts did not comply with defendant's requirement to maintain his GPS device.

After the agent learned that defendant's GPS was dead, he tried to contact defendant by phone but received a message indicating the recipient could not be reached at that time. Defendant made no attempt to contact the agent. The agent called defendant's mother, who told him that she had spoken to defendant via Facetime on his computer, and he told her that he was on his way to the parole office. The agent told her that defendant was in "dead battery" mode, and he needed to report immediately to get on the charger.

3

Defendant was arrested at approximately 10:30 a.m. on March 11, 2021, a block and a half from the parole office at the Daily Press building.

As to the second alleged violation, the agent testified that defendant was participating in group and individual sex offender therapy at "Open Door." The agent learned that defendant had missed a March 10, 2021 session of that program through an email that day from the Open Door office manager.

Due to Covid-19, the sex offender program was being held remotely via Zoom or GoToMeeting. Defendant was homeless. The agent testified that he did not know if defendant had access to Zoom; however, he said if he did not, then he could call in and use telephone audio. The agent had several times observed defendant with a phone, including when he used his phone to attend an intake of the Open Door program. Defendant had changed his phone number and phone several times.

The agent had told defendant that the parole office could assist him with attending his sex offender class. Indeed, the parole office had paid for phones for other parolees so that they could attend sex offender treatment.

Defendant testified that on March 10, 2021, from approximately 3:00 to 5:00 p.m., he was in front of the parole office to charge his GPS device and to attend an Open Door session. According to defendant, the agent or some other representative was supposed to be there to aid him in taking his class because he did not have a working cell phone. He acknowledged he attempted to charge his device at 5:04 p.m. while he was at the parole office because he was "trying to ensure that [he] got a good charge in order to make it through 12 hours that would be needed in order to go [] until the next morning."

4

However, he was unable to do so because the power had been turned off. Therefore, defendant went to the Daily Press building, where he plugged his GPS device into an external outlet to charge it. Defendant claimed that he left his device plugged into the outlet but acknowledged that the Daily Press would sometimes turn off their external outlets because homeless people using the outlets were "basically . . . stealing power."

Defendant acknowledged that he spoke with his mother via FaceTime the morning of his arrest at approximately 8:00 a.m. He said he used his fiancé's cell phone to make the call. He explained to his mother that he did not know whether the plug that he had used at the Daily Press worked properly.

Following argument by the parties, the court found that the People had shown by a preponderance of the evidence that defendant had violated both parole conditions by failing to attend his sex offender treatment program and by disabling his GPS device. The court revoked and reinstated defendant's parole with the condition that defendant serve 180 days in county jail. Defendant timely appealed.

II.

DISCUSSION

Defendant argues that the trial court violated his due process rights by admitting "unsubstantiated" hearsay at his parole revocation hearing—namely, the content of the VeriTracks records showing that he failed to maintain the required battery charge on his GPS device, and the email from Open Door showing he missed a treatment session. Defendant further contends that the trial court abused its discretion by finding he willfully violated his parole. For the reasons set forth below, we disagree and affirm.

5

A. *Mootness*

Preliminarily, we note that the parties agree that this appeal is not moot. Though defendant has already served his 180-day sentence, he remains on parole until October 19, 2023, and a ruling in his favor in this appeal would reduce his current parole term by 180 days. (See § 3000, subd. (b)(6) ["Time during which parole is suspended because the prisoner . . . has been returned to custody as a parole violator shall not be credited toward any period of parole unless the prisoner is found not guilty of the parole violation."]; *People v. Ellison* (2003) 111 Cal.App.4th 1360, 1368-1369 [notwithstanding completion of sentence, appeal not considered moot where the sentence may have negative collateral consequences.].) Courts in some cases have found appeals moot where the defendant was no longer in confinement or on parole when the appeal was heard. (See, e.g., *People v. DeLeon* (2017) 3 Cal.5th 640, 645-646.) Because defendant is still serving a parole term that could be shortened if he prevails here, we agree with the parties that the appeal is not moot.

B. *Hearsay Objections*

Hearsay is a "statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) At trial, hearsay evidence is admissible only if it falls within an established exception to the hearsay rule. (Evid. Code, §§ 1200, subds. (a) & (b), 1201.) However, at probation or parole revocation hearings, hearsay "that bears a substantial guarantee of trustworthiness is admissible . . . . 'In general, the court will find hearsay evidence trustworthy when there are sufficient "indicia of reliability." ' [Citation.]"

6

(*People v. Buell* (2017) 16 Cal.App.5th 682, 689.) "[T]he revocation of parole [or probation] is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole [or probation] revocations." (*Morrissey v. Brewer* (1972) 408 U.S. 471, 480; see *People v. Arreola* (1994) 7 Cal.4th 1144 (*Arreola*).) The admission of hearsay at a parole revocation hearing may be error where it fails to satisfy the minimal due process requirements for the hearing, such as the opportunity for the defendant to be heard and to present evidence, and "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." (*Morrissey*, at p. 489; see *Arreola*, at pp. 1152-1154.)

Hearsay thus should be excluded from a probation or parole revocation hearing when the "need for confrontation is particularly important . . . because of the opportunity for observation of the witness's demeanor." (*Arreola*, *supra*, 7 Cal.4th at p. 1157.) Hearsay evidence that is properly viewed as a substitute for live testimony, such as statements by victims or witnesses, should also be excluded. (*People v. Abrams* (2007) 158 Cal.App.4th 396, 405 (*Abrams*); see *Arreola*, *supra*, 7 Cal.4th at p. 1157.)

On the other hand, at a parole revocation hearing, hearsay is admissible when confrontation will not materially aid the decisionmaker. This may be the case with records that show "routine matters such as the making and keeping of probation appointments, restitution and other payments, and similar records of events." (*Abrams*, *supra*, 158 Cal.App.4th at p. 405; see *Arreola*, *supra*, 7 Cal.4th at p. 1157.) A probation or parole officer is not likely to have personal recollection of these matters and would

7

have to consult records, such as testifying to the failure of a parolee to report. (*People v. Gomez* (2010) 181 Cal.App.4th 1028, 1038 (*Gomez*).) Cross-examination and demeanor of the witness are not significant factors in evaluating the credibility of an officer's foundational testimony about the contents of the parole agency's records. Such records generally bear indicia of reliability and are admissible at a parole revocation hearing. (*Ibid.*; *Arreola*, at p. 1157; *Abrams*, at p. 405.)

We review the trial court's admission of hearsay evidence for an abuse of discretion. (*People v. Rodriguez* (2017) 16 Cal.App.5th 355, 373 (*Rodriguez*).) We will not disturb the court's ruling " 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).)

### 1. VeriTracks Records

Defendant contends that the VeriTracks device charging and battery expiration records constituted inadmissible hearsay. The People contend that the evidence was not hearsay but rather a computer-generated record that was the result of an automated process free of human intervention. We agree with the People that the evidence did not qualify as hearsay. While upon objection a proponent of introducing computer-generated records must provide foundational evidence the computer was operating properly, such evidence is not hearsay. (*Rodriguez*, *supra*, 16 Cal.App.5th at p. 374.) Although the trial court did not overrule the defendant's objection on this basis, we may affirm the trial

8

court's ruling if it is correct upon any theory supported by the record.  (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

In *Rodriguez*, the court concluded that "[t]he computer-generated report of the GPS data generated by defendant's ankle monitor did not consist of statements of a person as defined by the Evidence Code, and did not constitute hearsay as statutorily defined."  (16 Cal.App.5th at p. 381.)  *Rodriguez* explained that other cases, including out-of-state cases, distinguished " 'between computer-stored records, which memorialize the assertions of human declarants, and *computer-generated records, which are the result of a process free of human intervention*.' "  (*Id.* at p. 380.)  Because in that case the defendant's ankle monitor automatically transmitted information to the software server, from which a GPS report was retrieved, there was " 'no statement being made by a person regarding the data information so recorded.' "  (*Id.* at p. 381.)

Here, like the GPS evidence in *Rodriguez*, the VeriTracks computer-generated evidence did not constitute hearsay.  As in *Rodriguez*, defendant's device automatically sent signals of his location to the GPS, which automatically generated the computer data about defendant's location on the specific dates and times, as well as his charging history, so that there was no statement being made by a person regarding the data information being recorded.  (See *Goldsmith*, *supra*, 59 Cal.4th at pp. 273-274 [digital photographs automatically taken by a machine and data, such as date and time, which a computer automatically generates and imprints are not hearsay]; *People v. Nazary* (2010) 191 Cal.App.4th 727, 754 [computer-generated receipts, which show the date, time, and

totals, are not statements of a person], overruled on other grounds in *People v. Vidana* (2016) 1 Cal.5th 632, 647-648.)

The agent testified to his familiarity with, and knowledge of, how the VeriTracks system worked. He described how the Victorville GPS unit used VeriTracks to monitor GPS devices for the 296 sex offenders under its supervision and explained how it would keep track of information such as their "voltage, the batteries, the location, and it also stores all their informational data, addresses." While parole agents could place notes from the VeriTracks information in a parolee's case file, the agent explained that "the actual documentation is stored in the VeriTracks system." He testified that the system "notifies us of events, alerts, charging. It . . . shows us how long the person is charged, when they plugged in, when they unplugged. It monitors pretty much every detail of the device, itself." The agent had used VeriTracks numerous times to locate and make contact with defendant. He testified that when VeriTracks system detects a dead battery on the GPS device, it triggers VeriTracks to send a text message to the parole agent of record. The agent further explained that this happened in defendant's case, causing him to personally review defendant on the VeriTracks system, verify that he had a dead battery, and observe his charging patterns on March 10, 2021.

While defendant claims the information in the VeriTracks system is not wholly computer-generated, he does not dispute that the information about charging times, dead battery, and location was all computer-generated. That information did not represent statements placed into the computer by out-of-court declarants. Additionally, there is no indication here that parole agents can alter or manipulate someone's GPS data transmitted

10

by the device and depicted in the VeriTracks computer system. (See *Rodriguez*, *supra*, 16 Cal.App.5th at p. 381.) The critical information in this case (including the device's battery life and defendant's charging history) was computer generated and thus did not constitute hearsay under California law. Therefore, the trial court did not abuse its discretion in permitting the agent to testify about the VeriTracks records.

2. Open Door Records

Defendant contends that the trial court violated his right to due process when it admitted the agent's testimony to the contents of the email he received from Open Door pursuant to the business record exception to hearsay. (Evid. Code, § 1271.) The People argue that even if the evidence was hearsay, it was nevertheless admissible as reliable documentary evidence. We agree with the People.

In this case, the agent testified about defendant's failure to perform a required act: defendant did not attend his sex offender treatment program on March 10, 2021. As in *Abrams* and *Gomez*, the presence of the Open Door office manager, "likely would not have added anything to the truth-furthering process, because [she] would be testifying to a negative." (*Abrams*, *supra*, 158 Cal.App.4th at p. 404.) We have no reason to suspect that the office manager's demeanor would matter in evaluating the credibility of her foundational testimony pertaining to the contents of an email regarding defendant's failure to attend the program. (*Arreola*, *supra*, 7 Cal.4th at p. 1157.) An email about this simple matter that a person did not attend a session bears "the requisite indicia of reliability and trustworthiness so as to be admissible" in a parole revocation hearing. (*People v. O'Connell* (2003) 107 Cal.App.4th 1062, 1066-1067 [single-page report from

11

drug program manager stating a defendant had been terminated from the program due to too many absences was "akin to the documentary evidence that traditionally has been admissible at probation revocation proceedings" and "bore the requisite indicia of reliability and trustworthiness so as to be admissible."].) The purpose of calling the office manager to testify would be simply to authenticate the email containing the information that she would likely not recall from memory. (*Arreola*, at pp. 1156-1157.) We have no reason to conclude that it would be important for defendant to confront the office manager so the trial court could evaluate her demeanor.

In any event, defendant does not dispute that he did not attend his sex offender treatment program on March 10, 2021. The agent testified that he learned from a telephone call to an Open Door employee that defendant had missed a session on March 10, 2021, and had made no attempt to attend the program. In the absence of any evidence contradicting this information in the email, we cannot see a due process violation in failing to call the office manager to testify as to the truth of the contents of her email. (*Gomez*, *supra*, 181 Cal.App.4th at p. 1039.) The trial court did not abuse its discretion by permitting the agent to testify regarding the contents of the email from Open Door.

C. *Willful Violation of Parole*

Defendant contends the trial court's revocation order must be reversed because the evidence was insufficient to support a finding that he willfully disabled his GPS device or failed to attend his sex offender treatment program. We disagree.

A trial court has "very broad discretion" when determining whether revocation is warranted. (*Rodriguez*, *supra*, 51 Cal.3d at p. 443.) We review a revocation order for

12

abuse of discretion and examine the trial court's factual findings for substantial evidence. (*People v. Butcher* (2016) 247 Cal.App.4th 310, 318.)

Under the substantial evidence standard, our task is to decide "whether, upon review of the entire record, there is substantial evidence of solid value, contradicted or uncontradicted, which will support the trial court's decision. In that regard, we give great deference to the trial court and resolve all inferences and intendments in favor of the judgment. Similarly, all conflicting evidence will be resolved in favor of the decision." (*People v. Kurey* (2001) 88 Cal.App.4th 840, 848-849, fns. omitted.) If the evidence reasonably justifies the trier of fact's findings, the reviewing court's opinion that the evidence might also support a contrary finding does not warrant reversal. (*People v. Jones* (2013) 57 Cal.4th 899, 961.)

Findings are "based upon a preponderance of evidence" that may include hearsay from parole agents. (§ 3044, subd. (a)(5).) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

"Any person who is required to register as a sex offender (Pen. Code, § 290) and who is released on parole upon the condition they wear a global positioning system (GPS) device, or other electronic monitoring device (§ 3010.10, subd. (a)), is prohibited from removing, disabling, or rendering the device inoperable. (§ 3010.10, subd. (b)). If a

13

parolee violates this provision, the parolee is required to be incarcerated in a county jail for 180 days.  (§ 3010.10, subd. (e).)" (*People v. Schaffer* (2020) 53 Cal.App.5th 500, 503, fn. omitted.)

To revoke parole, the evidence must support a conclusion that defendant violated his or her terms of parole willfully.  (See, e.g., *People v. Galvan* (2007) 155 Cal.App.4th 978, 984 [probation violation finding reversed because failure to report to probation as required was not willful where defendant had been deported after release from county jail]; *People v. Zaring* (1992) 8 Cal.App.4th 362, 379 [probation violation finding reversed where appearing 22 minutes late for a hearing was not willful due to a change in circumstances that required the defendant to take her children to school before going to court].)  Willfulness requires " 'simply a purpose or willingness to commit the act . . . ,' without regard to motive, intent to injure, or knowledge of the act's prohibited character.  [Citation.]  The terms imply that the person knows what he is doing, intends to do what he is doing, and is a free agent.  [Citation.]  Stated another way, the term 'willful' requires only that the prohibited act occur intentionally.  [Citations.]" (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1438.)

In this case, defendant's GPS parole condition required him to participate in continuous electronic monitoring using a GPS device and charge the battery on his device at least twice a day for a full hour, approximately 12 hours apart.  He was also required to contact his parole agent immediately when the GPS device vibrated or made an audible tone.  The agent testified that he had gone over the terms and conditions of his parole with defendant, and it was uncontroverted that defendant understood these terms.

14

The agent testified that when defendant had previously told him he was having issues with the device, the agent told him he was not charging it correctly and showed him how it should be plugged in. Despite this, the charging records indicate that on March 10, 2021, and March 11, 2021, defendant charged the GPS for 55 minutes on the morning of March 10, but thereafter his charging periods were intermittent and short, lasting only 60 to 90 seconds. Defendant initially claimed that he was unaware of problems with the outlet, thought his device was charging consistently, and denied hearing any audible vibrations indicating that his battery was dying. He then contradicted himself and admitted that he knew there was a problem with the outlet and worried whether the device was charged properly. Specifically, defendant testified that the outlet at the Daily Press tended to be unreliable because the Daily Press would sometimes turn off the power, but he also said a "big storm" had "[blown] through" the previous day, causing power outages. Defendant acknowledged that when he spoke to his mother on the morning of March 11, he told her he needed to go to the parole office to charge his device because he was not sure the device had charged properly at the outlet at the Daily Press. Defendant nevertheless did not go to the parole office or contact his parole agent, as required by his parole terms. While he used his fiancé's phone to call his mother, he chose not to use the same phone to call his parole officer because he would violate his parole terms by being with his fiancé, another felon.

The trial court was free to disregard defendant's testimony as not credible and conclude based upon the agent's testimony that there was sufficient evidence that defendant willfully violated the terms of his parole. Although defendant claimed his

15

device did not emit an audible vibrational tone to alert him to the dying battery, the agent testified that when he retrieved the GPS device and plugged it in, it worked just fine. The agent testified that he was familiar with the outlet at the Daily Press where defendant and other parolees charged their devices and, contrary to defendant's claims, it worked fine. Even defendant acknowledged that his fiancé had used the same outlet at the Daily Press to charge her cellphone and managed to get a full charge. The agent further explained that defendant's charging history involved having his device on and off the charger. It was within the court's discretion to accept the agent's testimony, which provided substantial evidence supporting the court's finding that defendant willfully violated the terms of his parole by not properly charging his GPS device and failing to immediately contact his parole agent.

Substantial evidence likewise supported the trial court's finding that defendant willfully violated the terms of his parole by failing to attend a session of the Open Door sex offender treatment program. While he claimed he stood outside the parole office on March 10, 2021, from 3:00 p.m. to 5:00 p.m. because he assumed that his parole agent or someone else at the parole office would assist him in accessing the class, defendant made no attempt to contact the agent. Defendant offered no evidence that he made any attempt to contact anyone at the parole office to assist him, nor that he tried to contact Open Door for assistance. The failure to take any initiative to get assistance to attend his program supports the trial court's finding of a willful violation of his treatment condition. (See *Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, 787 [a person's "[l]ack of diligence may be

16

deemed willful in the sense that the party understood his obligation, had the ability to comply, and failed to comply."].)

Having found substantial evidence to support the trial court's ruling, we must affirm the trial court's finding that defendant willfully violated the terms of his parole.

## III.

## DISPOSITION

The order finding defendant in violation of his parole is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL_____
                                                              J.

We concur:

RAMIREZ_____
                P. J.

CODRINGTON_____
                J.

17